UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK FAGAN,

    Plaintiff,

    v.

LIFE INSURANCE CO. OF NORTH AMERICA, et al.,

    Defendants.
_____/

No. C 09-2658 PJH

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

The parties' cross-motions for summary judgment came on for hearing on June 30, 2010 before this court. Plaintiff Mark Fagan ("plaintiff") appeared through his counsel, William Green. Defendants Novartis Vaccines and Diagnostics, Inc. ("Novartis") and Life Insurance Company of North America ("LINA")(collectively "defendants") appeared through their counsel, Charan Higbee. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS plaintiff's motion for summary judgment and DENIES defendants' motion for summary judgment, for the reasons stated at the hearing, and as follows.

## BACKGROUND

This is an ERISA case, challenging the denial of payment of disability insurance benefits. Forty year old plaintiff Mark Fagan was employed by defendant Novartis as a software designer from September 1, 2004 until February 29, 2008 – his last day of work. See Administrative Record ("AR") 0621. Plaintiff's specific job title was "Lead Specialist, Informatics." AR 0601-602.

While an employee, plaintiff was enrolled in a Long Term Disability ("LTD") plan pursuant to a welfare benefit plan governed by ERISA (the "Policy") and insured under a

group insurance policy issued by defendant LINA, Group Policy No. FLK-960101.[1]  LINA was also the claims administrator with respect to plaintiff's claim for LTD benefits.

A.  The Relevant Policy Terms

The Policy contains the relevant insuring provisions covering total disability benefits. Of particular note here, it contains the following <u>Disability/Disabled</u> provision:

> "The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is: [1] Unable to perform the material duties of his or her Regular Occupation; and [2] Unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation."

<u>See</u> AR 0298.  "Regular Occupation" is furthermore defined as the "occupation the Employee routinely performs at the time the Disability begins."  AR 0316.

An <u>Elimination Period</u> also applies under the policy, which is in turn defined as "the period of time an Employee must be continuously Disabled before Disability Benefits are payable."  AR 0305.

Finally, the Policy contains a limitation that is pertinent here – the "<u>Limited Benefit Periods</u>."  That limitation states as follows:

> "The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions.  Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions[:] 1) Alcoholism 2) Anxiety disorders 3) Delusional (paranoid) disorders 4) Depressive disorders 5) Drug addiction or abuse 6) Eating disorders 7) Mental illness 8) Somatoform disorders (psychosomatic illness)...".

<u>See</u> AR 0308.

B.  Background Facts

1.  <u>History of Plaintiff's Medical Condition</u>

Plaintiff's pain-related issues began in 1995, when he suffered a compound fracture

---

[1] While many of the documents in the administrative record refer to Cigna, not LINA, defense counsel explained at the hearing that LINA is a CIGNA company.

2

of his right tibia and fibula. A nail was inserted into his right knee, and then eventually removed. In the years following this injury, however, plaintiff began to experience pain in other parts of his body, particularly in his lower back area. AR 469.

Beginning in March 2007, plaintiff's lower back pain dramatically increased in severity, and went from intermittent to constant. One of plaintiff's primary medical providers, Dr. Anthony Somkin, referred plaintiff to Dr. Michael K. Park, a physical medicine and rehabilitation specialist.

Dr. Park examined plaintiff and on September 20, 2007 conveyed his findings to Dr Somkin. AR 0432. Dr. Park noted that plaintiff had a history of back pain, with pain centralized in the lower back. Dr. Park also noted that plaintiff experienced "sharp pain" at the L4-L5 intervertebral space, and "symptoms of diskogenic pain from L4-L5 disk." Id. Dr. Park recommended an MRI and an epidural injection. AR 432, 469.

On October 3, 2007, plaintiff had an MRI. AR 426, 469. Dr. Park noted that the MRI study showed "5 mm central protrusion of disk at L4-L5 with annular tear." See AR 469. Dr. Park also found that plaintiff was reporting that the pain was at times "excruciating." Id. Dr. Park thereafter again recommended a "second epidural steroid injection at L5." Plaintiff underwent an epidural steroid injection at L5 on October 15, 2007. AR 469-70. Plaintiff and Dr. Park reported that the injection failed to provide any pain relief. AR 470.

Several months later, in February 2008, Dr. Park referred plaintiff for examination by Dr. Gordon Tang, a physician with East Bay Neurosurgery and Spine, Inc. AR 605-007. On March 20, 2008, Dr. Tang reported on the results of his examination. He noted that the MRI of plaintiff's cervical spine "appeared to be fairly unremarkable." AR 606. Dr. Tang also noted that, although plaintiff had started physical therapy, plaintiff was "fairly pessimistic" about the idea that the therapy would be helpful. Dr. Tang recommended a conservative course of treatment involving pilates, acupuncture, and other modalities. If all conservative measures were to fail, Dr. Tang reported that the plaintiff would then be a reasonable candidate to have a discogram, in order to try and "elucidate" the source of the

3

problem, and to perform adequate medical intervention from there.  AR 607.

On April 3, 2008, plaintiff was examined by Dr. Gabriel Schonwald at the Stanford Pain Management Clinic.  AR 583-88.  That same day, Dr. Schonwald reported the findings from this visit to plaintiff's primary physician, noting the following: plaintiff's past medical history was "significant" for hypothyroidism and depression and anxiety; plaintiff felt that his pain-related problems initially stemmed from his lower leg injuries, but that recently, the pain in his back – which had a gradual onset – had become the primary problem; plaintiff's back pain was making him depressed and was the reason for his having left the job at Novartis to go on disability; and plaintiff's back pain – which is located in the L3-5 areas of his spine – is worse while sitting and relieved by lying down.  AR 583-86.

Dr. Schonwald also reported on the results of plaintiff's physical examination of plaintiff and found: that plaintiff has a normal gait; is noted to have "very significant paraspinal muscle tenderness with tremendous spasm in his erector spinae group bilaterally in the quadratus lumborum;" and that plaintiff's sensory exam is "entirely within normal limits."  AR 586.  Dr. Schonwald also noted that, based on the prior year's MRI results, the etiology of plaintiff's lower back pain "may be due to facet arthropathy bilaterally as well as a discogenic component."  Id.  In terms of recommendations, Dr. Schonwald stated, among other things, that a psychological recommendation would await the report by a Dr. Joshua Kirz, but that in Dr. Schonwald's opinion, the psychological issues were "an overriding issue," in the sense that plaintiff was once a fully functional individual working for a prestigious firm, and was no longer able to work.  AR 587.  Dr. Schonwald also closed the report by noting: "The patient probably made a wise decision, taking a disability at this time, as not to have a bad performance record and to deal with his problem, which is a very mature way of dealing with this...".  AR 587.

A few days afterward, on April 8, 2008, Dr. Kirz of the Stanford Pain Management Center provided his psychological report to Dr. Somkin.  Dr. Kirz noted:  that plaintiff's medical records indicated a history of depression, insomnia, and GERD; plaintiff's current

4

mood was described by plaintiff as demoralized, depressed, and increasingly hopeless about his condition; that plaintiff had appeared on time at his appointment with Dr. Kirz and that his "cognition appeared grossly intact, with no evidence of sedation or compromise;" that plaintiff exhibited mild to moderate symptoms of depression when tested; and that plaintiff "appears to have developed a significant reactive depression" subsequent to his injury, "which could be characterized as a major depressive episode or an adjustment disorder with depressed mood." AR 578-81.

On May 2, 2008, Dr. Schonwald sent a follow-up letter to Dr. Somkin. AR 564. Dr. Schonwald, as before, noted that the MRI scans, which the Stanford doctors had not seen, disclosed that the etiology of plaintiff's lower back pain might be due to the facet arthropathy bilaterally, as well as a discogenic component. AR 564. A physical examination, however, did not evidence any active radiculopathy. Id. Final recommendations largely remained the same as those reported in Dr. Schonwald's previous letter. In terms of psychological intervention, however, Dr. Schonwald noted that if the plaintiff were taken slowly off narcotics, which did not seem to be helping him, and started on appropriate antidepressants, plaintiff would improve markedly. AR 566. At that point, and in the event plaintiff were still experiencing significant back pain, plaintiff could have another evaluation by the pain psychologist, specifically with regard to the plaintiff being a candidate for "spinal cord stimulation." Id.

On April 10, 2008, plaintiff returned to Dr. Park for a follow-up appointment. AR 470. Dr. Park concluded that a discography seemed to be "the reasonable next step," and this was performed on April 28, 2008. AR 598-599. The discography revealed that plaintiff had a "posterior annular tear at L4-5 with concordant back pain and also mild degenerative disk disease with posterior annular degeneration with reproducible pain at that L5-S1." AR 575. In reporting on the results, Dr. Park noted that plaintiff was a candidate for "disk replacement procedure" and recommended that plaintiff consult with Dr. Vikram Talwar regarding the procedure. Id.

Dr. Talwar examined plaintiff on June 24, 2008. In his report of the exam, Dr. Talwar noted that he had looked at the MRI scan report taken the year preceding and that it "seems as though [plaintiff] has broad-based disc herniations or disc bulges, which are contral in nature." AR 439. Dr. Talwar noted that these are "painful lesions for patients." Dr. Talwar also performed a physical examination of plaintiff, and found that plaintiff had "tenderness to palpation over his low back from the L-4 through S1 area." Plaintiff's motor strength, sensation, and deep tendon reflexes were all normal. In looking at x-rays, however, Dr. Talwar noted that they showed that plaintiff had "quite significant degenerative disc disease at L5-S1" although the L4-L5 level looked normal. AR 440. Dr. Talwar reported that he had spoken with the plaintiff about the possibilities of a fusion surgery versus a disc replacement surgery, and that he requested that plaintiff think about those options, and then come back with the actual MRI scans, so that he could review them with plaintiff. AR 440.

Plaintiff duly returned to Dr. Talwar on July 25, 2008. He spoke with Dr. Talwar about the potential for surgery. Dr. Talwar reported on that meeting, and noted that plaintiff had thought a lot about his options, and wanted to try to do anything in his power to avoid surgery. AR 535. To that end, one of the things that plaintiff had not tried yet was radiofrequency ablation and/or facet joint injections from L4 through S1. Thus, Dr. Talwar recommended that plaintiff return to Dr. Park for facet injections and to consider radiofrequency ablations. AR 535. Notably, Dr. Talwar also stated that plaintiff "has had a positive discogram so I think he is in fact heading toward a lumbar surgery," but that Dr. Talwar "would like to see what happens if we inject into his facet joints," for pain purposes, in the hopes of avoiding surgery. See id.

On August 4, 2008, plaintiff indicated that his appointment for a lumbar facet joint injection with Dr. Park had been scheduled for August 25, 2008. AR 537-38.

2.  Denial of Plaintiff's Claim

Shortly after becoming disabled, plaintiff submitted his disability claim to defendant

LINA.

In connection with his claim, on May 13, 2008, plaintiff provided documentation in support of the LTD claim. AR 591-600. Plaintiff's documentation included several letters from Dr. Park from fall 2007, up through the end of April 2008, as well as the report of the MRI scan taken in October 2007. AR 591. The documentation also included reports from Drs. Kirz, Schonwold, and Somkin. Id.

On May 5, 2008, plaintiff's primary care physician, Dr. Somkin, had estimated that plaintiff could return to work, with restrictions, on June 30, 2008. AR 589. In a telephone call with LINA on June 16, 2008, Dr. Somkin again gave the same information, although he additionally noted that plaintiff's pain was a "good enough" reason to preclude plaintiff from being able to work. AR 0123. Plaintiff himself reported that he was unable to perform his occupation, because he could not sit, and was on medication, on July 3, 2008. AR 0112.

On July 17, 2008, plaintiff submitted further information in response to letters from Cigna. AR 0437. Plaintiff detailed his current course of treatment, which was to follow the recommendations set forth by the Stanford Management team. Plaintiff also detailed the reasons why he could not perform his occupation. He stated that he could not sit at a workstation for more than 20 minutes, and that after doing so, he would have to lie down. If not, he would be incapacitated for anywhere from an hour to several hours while he recovered. Taking short breaks every 20 minutes would not be helpful, as it would require long breaks to alleviate the discomfort. Furthermore, plaintiff noted that while his occupation is "sedentary," this nomenclature is misleading, because even sitting at his workstation required turning, twisting, sitting, standing, bending and reaching – all of which were precluded due to plaintiff's severe pain. AR 437-38.

On July 25, 2008, Dr. Somkin completed a Physical Abilities Assessment ("PAA") in connection with plaintiff's claim. AR 434-35. Dr. Somkin reported that plaintiff could occasionally (defined as less than 2.5 hours per day) sit, stand, walk, and lift/carry eleven or more pounds. AR 434. On July 29, 2008, plaintiff completed a Disability Questionnaire

form for defendant, wherein he stated that he had not been without pain for more than 13 years, and could not work due to his degenerative disc disease and chronic pain and fatigue. AR 532-34.

Dr. Penny Chong, board certified in internal medicine, reviewed plaintiff's claim information for LINA, and prepared a report dated August 13, 2008. AR 524-26. She concluded, "with a reasonable degree of medical certainty," that plaintiff is capable of a sedentary job with changes in position at will. AR 524. She noted that physical examinations generally failed to demonstrate the presence of limitations, that neurologically, plaintiff was intact, and that his stance and gait are normal. Dr. Chong also noted Dr. Somkin's assessment – that plaintiff could occasionally lift 100+ pounds, and she furthermore noted that Dr. Schonwald recommended that narcotics be discontinued altogether – supporting plaintiff's ability to be present at the job without cognitive impairments caused by plaintiff's narcotics use. Id.

On August 15, 2008, LINA denied plaintiff's claim for benefits. AR 261-62. LINA acknowledged plaintiff's self-reported limitations and the use of narcotics to help, but based on the reports provided by Dr. Tang, Dr. Schonwald, and Dr. Talwar, noted that plaintiff's use of narcotics was contributing to plaintiff's depression, and furthermore that plaintiff should be undergoing massage, acupuncture and pilates as treatment. AR 261-62. LINA noted that the Department of Occupational Training rates plaintiff's job as sedentary – defined as a mostly sitting job that consists of lifting, carrying, pushing and pulling up to 10 lbs occasionally, as well as standing and walking for brief periods of time. And according to plaintiff's own statement that he could drive for 20 minutes, take a 10-15 minute walk and use a laptop computer, he could perform his occupation. AR 262.

       3.     <u>Plaintiff's Two Appeals of Defendant's Denial</u>

Plaintiff appealed the denial of benefits via letter on August 29, 2008, and sent follow up letters to LINA requesting confirmation that plaintiff had 180 days in which to submit his record on appeal. AR 508. On February 6, 2009, plaintiff's attorney wrote to LINA and

notified them that plaintiff was appealing the denial, and further enclosing a January 22, 2009 letter from Dr. Somkin explaining some of the bases for plaintiff's appeal. AR 468. The letter from Dr. Somkin outlined his belief that defendant had made several errors with respect to its conclusions regarding plaintiff's condition. AR 469-475. Dr. Somkin reviewed the plaintiff's medical history in the letter, claiming that it showed marked disc degeneration, and then went on to detail the functional requirements of plaintiff's job and to explain how plaintiff could not meet those requirements. Dr. Somkin challenged Dr. Chong's opinion and assessments point by point, and concluded that Dr. Somkin had no doubt that plaintiff was disabled from performing his regular occupation. AR 475.

Drs. Park and Talwar also submitted letters on March 23, 2009 and February 6, 2009, respectively, indicating their full agreement with Dr. Somkin's assessment and response to defendant's denial, as set forth in Dr. Somkin's January 22 letter. AR 450, 460.

Defendant responded to plaintiff's appeal by having Dr. Michael Weiss, board certified in orthopedic surgery, conduct a peer review of plaintiff's medical records. He submitted a report dated April 16, 2009. AR 336-39. Dr. Weiss reviewed the medical history and reports on file, up to and including Dr. Somkin's January 22, 2009 letter, and Drs. Park and Talwar's concurring letters. Dr. Weiss concluded, based on his review, that the medical records supported restrictions and limitations as outlined "by Dr. Talwar on July 25, 2008." AR 338. Dr. Talwar's July 25 2008 evaluation seemed "to document the ability to do sedentary to light duty work" according to Dr. Weiss, and this conclusion, in conjunction with the fact that plaintiff "has not undergone a lumbar operation, has no true neurologic deficit, and whose overriding issue is complaints of pain and not a specific objective anatomic abnormality," supported the conclusion that plaintiff could perform his occupation at a "light duty level." AR 338.

Dr. Weiss's report also revealed that he had called Drs. Talwar, Park and Somkin to discuss plaintiff's case, but that none of these physicians returned his call. AR 338. Dr.

9

Weiss left his messages during the lunchtime hour on April 14, and completed his report on April 16.

On April 23, 2009, and in reliance on Dr. Weiss's findings, LINA notified plaintiff that it was affirming the previous denial of plaintiff's claim for LTD benefits.  AR 240.

On June 8, 2009, plaintiff's attorney sent a letter to defendant advising that plaintiff was appealing the denial of his LTD claim for a second time.  See AR 340-41.  In that letter, plaintiff's counsel also included an enclosure from the Social Security Administration ("SSA"), documenting the SSA's determination that plaintiff was totally disabled.  Plaintiff's counsel also pointed out, in connection with Dr. Weiss's reliance on Dr. Talwar's July 25 evaluation indicating plaintiff's ability to do "sedentary to light duty work," that no such evaluation existed in the file.  AR 340-41.

On December 15, 2009, plaintiff's counsel submitted a May 12, 2008 report by Dr. Schonwald in support of the second appeal.  On January 11, 2010, counsel submitted an MRI and CT scan of plaintiff's lumbar spine in connection with the second appeal.  AR 901-05, 923-26.

On July 7, 2009, LINA sent plaintiff a letter indicating that it would schedule an Independent Medical Examination ("IME") as part of the evaluation of the claim on appeal and to determine plaintiff's functional ability.  AR 233-34.  Plaintiff wished to have his counsel attend and audio record the IME, however, and LINA refused to allow any audio recordings.  Plaintiff's counsel sought to arrive at a compromise with LINA:  plaintiff would agree to attend the IME exam and would forego an audio recording of the exam, in exchange for LINA allowing plaintiff to exclude the exam from the record in the event plaintiff objected to it.  Plaintiff would not, however, allow defendant to similarly exclude the report in the event defendant objected to it.  AR 937-38.  LINA was not in agreement, and it chose not to have an IME of plaintiff completed and preferred to rest upon the record submitted.  AR 811.

As an alternative, however, defendant obtained another peer review from a

physician specializing in orthopedic surgery, Dr. Agnew.  Dr. Agnew provided his report to LINA on January 7, 2010.  AR 881-82.  Dr. Agnew considered all the evidence thus far in the record, including Dr. Schonwald's report dated May 12, 2008.  Dr. Agnew concluded that none of the additional information reviewed would modify or alter any of the opinions set forth in the initial review of April 15, 2009 and clarified on July 22, 2009.  AR 881.

On January 20, 2010, Dr. Agnew followed up with another report noting his consideration of December 31, 2009 CT and MRI scans.  AR 887-89.  In that report, Dr. Agnew noted that the MRI demonstrated that the L5-S1 posterolateral disc herniation had "increased in size with a new posterior deflection of the descending left S1 nerve root that was not detected" previously, and furthermore that the lumbar CT scan "showed mass effect on the descending left S1 nerve as it crossed the L5-S1 disc space...".  AR 888-89.  Dr. Agnew concluded, however, that since there were no medical records available from recent evaluation to suggest that "the disc abnormalities actually produce neurologic deficits or for that matter, cause the need for additional treatment," there was no support for the concept that "this young patient is unemployable."  AR 889.

On March 31, 2010, LINA sent a letter to plaintiff's counsel advising that defendant was upholding its prior decisions to deny plaintiff's claim for LTD benefits.  AR 810-12.

C.      The Instant Action

Plaintiff filed the instant action on June 15, 2009.  The complaint alleges a single cause of action under ERISA.  See generally Complaint.

Plaintiff and LINA have now filed cross-motions for summary judgment.

**DISCUSSION**

A.      Legal Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).  Material facts are those which may affect the outcome of

11

the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where an ERISA action claiming wrongful denial of benefits is reviewed under a de novo standard on summary judgment,[2] the court must determine whether benefits were correctly denied based on the evidence in the administrative record. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006)(en banc). The court must grant summary judgment if the administrative record reveals no genuine issue of material fact.

B. Analysis

In order to properly evaluate LINA's denial of plaintiff's claim for disability benefits, the court must resolve the following issues raised by the parties in their cross-motions: (1) whether plaintiff was disabled during the Elimination Period, pursuant to the terms of the Policy; (2) whether, if so, the Limited Benefits Period provision of the Policy applies to limit plaintiff's entitlement to benefits; and (3) whether an award of attorney's fees and costs is appropriate. Plaintiff seeks summary judgment with respect to the first and third of these issues, while LINA cross-moves for summary judgment with respect to all three.

Applying the de novo standard of review, the court's role is to "evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." See, e.g., Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).

1. Whether Plaintiff was Disabled During the Elimination Period

The heart of the parties' dispute comes down to whether plaintiff was disabled under the terms of the Policy throughout the requisite Elimination Period, as defined therein – i.e., from March 1, 2008 through August 28, 2008. As noted, the Policy provides that an employee is considered disabled "if, solely because of Injury or Sickness, he or she is: (1) Unable to perform the material duties of his or her Regular Occupation; and (2) Unable to

---

[2] The parties previously stipulated that the appropriate standard of review to be applied is de novo review. See Docket No. 25.

12

earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." See AR 0298. Thus, here, if plaintiff was unable to perform the material duties of his regular occupation as a software developer/engineer,[3] plaintiff was entitled to LTD benefits.

Plaintiff's papers suggest that plaintiff's disability manifests via two separate but related means: a physical disability caused by his diagnosed back condition; and a cognitive impairment. With respect to the former, plaintiff's disability claim is rooted in his diagnosed back condition, the severity of pain inflicted because of it, and its effects on plaintiff's functional abilities. With respect to the latter, plaintiff's claim appears to be rooted in the effects of the drugs he took for his pain, on his resulting ability to function cognitively.

In pointing to evidence that his back condition rendered him unable to perform the material duties of his regular occupation, plaintiff highlights, among other facts, the following: that the MRI report in October 2007 showed a "central protrusion of disk of 5-mm size at L4-L5 with annular tear;" that Dr. Park examined plaintiff and found "sharp pain" at the L4-L5 intervertebral space; that Dr. Park then recommended and plaintiff had an epidural steroid injection at L5, with no reduction in pain; that plaintiff underwent a discography of his lumbar spine in April 2008 that revealed degenerative disc disease "with posterior annular degeneration with reproducible pain at the L5-S1;" that Dr. Park deemed plaintiff a candidate for disc replacement procedure; that Dr. Talwar examined plaintiff and found "tenderness to palpation" over plaintiff's lower back from L4 through S1; that Dr. Talwar concurred that plaintiff had "significant degenerative disc disease at L5-S1"; that Dr. Talwar opined that options included fusion surgery, disc replacement, or radiofrequency ablation and facet injections; that Dr. Schonwald at Stanford's pain management clinic also concurred that plaintiff had a disc condition that produced "concordant lower back pain and

---

[3] Plaintiff's official employment title was "Lead Specialist, Informatics." AR 0601-602. Defendant notes that this position is characterized as 'sedentary,' pursuant to the Department of Occupational Training. Plaintiff, too, appears to acknowledge the sedentary nature of the position. See, e.g., Pl. MSJ Br. at 8:16-19; AR 472.

13

are the sources of lower back pain condition;" and that CT and MRI scans taken in December 2009 reconfirmed that plaintiff's back condition was bad and increasing, with a "L5-S1 left posteriolateral disc hernia" that "increased in size with new posterior deflection" that was not previously detected. See, e.g., Pl. MSJ Br. at 23-24.

Plaintiff contends that his back condition causes him constant, severe pain requiring medication, all of which makes it impossible for plaintiff to perform the material duties of his occupation. Plaintiff points to Dr. Somkin's January 22, 2009 letter submitted in connection with plaintiff's appeal as evidence that his back treatment led to excruciating pain that in turn rendered plaintiff unable to perform his occupational functions. Dr. Somkin's letter contains a detailed analysis of all material duties of plaintiff's job (based on information and materials provided by plaintiff). AR 471. Dr. Somkin concluded, based on his personal observations and examination of plaintiff, that in his professional opinion, plaintiff's back condition prevented him from sitting for more than 20 minutes at a time, after which he must spend an extended period lying down (at least an hour). See AR 469-75. As such, even a sedentary job like software developer – which requires sitting, standing, reaching, bending, turning, twisting and the like throughout the work day – was too much for plaintiff. AR 472. Dr. Somkin also noted that, although plaintiff could perform some or even all of his job-related tasks on a particular day, plaintiff would pay the price at the end of the day when he would require such an extensive recovery as to exacerbate his symptoms and preclude plaintiff from continuing. AR 472-73.

In response, defendant does not dispute that plaintiff had a diagnosed back condition. Rather, defendant in essence advances the argument that plaintiff's demonstrated pain level was not so great so as to render plaintiff unable to perform the material functions of his job. Defendant highlights its own physician testimony based upon review of plaintiff's medical records, and highlights, among other things: that plaintiff's physical examinations by several doctors demonstrated that plaintiff had good strength and sensation in his muscles and had no weakness in his extremities; that his gate was normal;

that plaintiff suffered no neurologic symptoms; that it was recommended that plaintiff engage in activities like pilates and light exercise; that plaintiff himself stated he could drive for 20 minutes, played online poker and was planning on traveling to England; and that Dr. Somkin himself originally reported that plaintiff had an initial return to work date of June 30, 2008, and that plaintiff was capable of occasionally lifting up to 20 lbs.  AR 440, 565, 579, 584, 586, 606, 902-05.

Having reviewed the administrative record, and weighed the parties' competing interpretations of the evidence, it is plaintiff, on balance, who has the better argument.  As noted, plaintiff has submitted objective documentation of a degenerative disc problem experienced by plaintiff; evidence by his treating physicians of at least some significant manifestations of that pain; and evidence of the manner in which plaintiff's pain has, since 2008, been preventing plaintiff from being able to sit long enough to perform the material duties of plaintiff's job.  Defendants, by contrast, have failed to mount a persuasive showing that effectively contradicts plaintiff's and his doctors' proof that plaintiff's back condition and pain levels render plaintiff's unable to sit for more than 20 minutes at a time, or otherwise adequately perform his job duties.

To be sure, defendants have marshaled their own physician testimony that peer-reviewed plaintiff's medical records, and which at least facially supports defendants' finding of no disability.  However, defendants' physician testimony, and the denial letters based on them, rather conclusorily determined that plaintiff could simply perform "light duty work," without engaging in any detailed analysis demonstrating how.  See AR 240, 261-62.  Furthermore, to the extent that defendants' findings were based on the well-supported evidence that plaintiff exhibited no neurological defects, and that many of plaintiff's physical examinations showed normal results (e.g., lack of muscle atrophy and a normal gait, etc.), such facts are not determinative in this case.  The fact that plaintiff's atrophy scores and ability to walk are intact, for example, does not materially counter the fact of plaintiff's degenerative disc problem, or more importantly, plaintiff's complaint that the severity of the

pain resulting from the disc problem itself causes disabling pain that prevents him from performing his job duties.

Moreover, even looking at the findings that LINA relied upon that *were* related to plaintiff's ability to perform the material functions of his job, LINA's conclusions are not always based on an accurate reading of the supporting documentation. LINA's original denial of benefits, for example, noted that the Department of Occupational Training rates plaintiff's job as sedentary – defined as a mostly sitting job that consists of lifting, carrying, pushing and pulling up to 10 lbs occasionally, as well as standing and walking for brief periods of time. LINA then noted that, according to plaintiff's own statement that he could drive for 20 minutes, take a 10-15 minute walk and use a laptop computer, he could perform his occupation. AR 262. However, what plaintiff's statement actually disclosed was that he could drive for *up to* 20 minutes, that he could use a laptop computer from certain comfortable positions, and that he was just attempting to start a program that would allow him to work up to walking 10-15 minutes, twice a week. And while LINA's initial denial letter also noted that Dr. Somkin had issued an evaluation on July 25, 2008 that purportedly supports plaintiff's ability to lift 11-20 pounds occasionally, and to engage in the sitting that all parties agree is a material requirement of plaintiff's job, this is misleading. In actuality, what Dr. Somkin said is that plaintiff can "occasionally" – defined as less than 2.5 hours a day – sit, stand, and walk (Dr. Somkin did, however, state that plaintiff could life between 11-20 pounds). AR 434.

This last point is critical. LINA concedes that the Novartis definition of what a software employee does is to sit between 2.5 to 5.5 hours a day, and to stand for less than 2.5 hours. Yet, even according to the July 25 Somkin evaluation upon which defendant places great weight, plaintiff would not be capable of 'sitting' in accordance with the hours required by Novartis (since Dr. Somkin said plaintiff could only sit for less than 2.5 hours). AR 559, cf. 434.

In sum, what the court's review of the administrative record makes apparent is that

16

(1) plaintiff had a well-documented history of degenerative disc disease and reproducible physical pain, although plaintiff's physical examinations proved that plaintiff's muscles and extremities were otherwise healthy; (2) plaintiff and Dr. Somkin conveyed to LINA that plaintiff was unable to perform the primary function of sitting for more than 20 minutes at a stretch, and without requiring great periods of rest and lying down; and (3) LINA failed to undertake any detailed analysis of plaintiff's ability to perform the actual material functions of his job; and (4) and when it did, LINA relied on incomplete information.

Defendant seeks to explain away any deficiency in its assessment by arguing that plaintiff failed to attend an IME, and arguing that this failure should be counted against plaintiff. However, this issue is not as clear cut as defendant would have the court believe. Rather, what is clear is that plaintiff wanted to audio record the IME, and that the parties engaged in an ultimately unfruitful discussion over a compromise that would allow plaintiff to attend the IME, but preserve his right to object to the IME in the event plaintiff took exception to it. And ultimately it was defendant, and not plaintiff, that called off the IME. Thus, both parties contributed to the absence of an IME. At any rate, as plaintiff correctly points out, the plan administrator did not base the denial of benefits on plaintiff's failure to attend the IME. See Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, 349 F.3d 1098, 1104-05 (9th Cir. 2003)(noting ERISA rules parallel the general rule that "an agency's order must be upheld, if at all, on the same basis articulated in the order by the agency itself," not a subsequent rationale articulated by counsel"). As such, the IME issue is ultimately a non-dispositive one.

In sum, insofar as plaintiff's ability to perform the material functions of his own occupation, based on his back condition and the pain it occasioned, plaintiff has discharged his burden to show that he was disabled. Defendant has thus wrongfully denied plaintiff LTD benefits under the Policy, and summary judgment on this ground is accordingly GRANTED in plaintiff's favor. Defendant's cross-motion for summary judgment on this ground is DENIED.

17

It should be noted that, while the court is persuaded by plaintiff's evidence of a physical impairment, plaintiff does not fare so well in connection with his claim of cognitive impairment. With the exception of Dr. Somkin's January 22, 2009 report, plaintiff presents no credible objective evidence of his cognitive impairment. And defendant has correctly pointed out that Dr. Kirz at the Stanford Pain Management Clinic remarked that plaintiff's cognitive abilities were "intact" upon examination. Nonetheless, the court decides the disability issue based upon the documented existence of plaintiff's physical impairment.

2. <u>Whether the "Limited Benefit Period" Provision Applies</u>

Defendants contend that, even if the court disagrees with LINA's finding that plaintiff was not disabled under the Policy, the court should nonetheless decline to award more than 24 months of LTD benefits to plaintiff, because any disability was caused or contributed to by depression and anxiety. As such, the Policy's "Limited Benefit Periods" – which states that only limited benefits will be paid for a Disability "caused by, or contributed to by," a depressive or anxiety disorder – applies. AR 305.

In support of their argument that plaintiff's disability was "contributed to by" a depressive or anxiety disorder, defendants highlight the fact that Dr. Kirz administered psychological tests and found a GAF score of 50 – which denotes serious symptoms and serious impairment in social, occupational, or school functioning; that Dr. Schonwald saw plaintiff and thought that plaintiff's psychological condition "seems to be an overriding issue" with respect to plaintiff's inability to work; and that Dr. Schonwald thought that plaintiff could benefit from seeing a psychiatrist or pain psychologist. AR 580-81, 565-66.

As these facts highlight, there is support for the conclusion that plaintiff did, in fact, suffer from some form of psychological impairment in conjunction with his physical disability. However, defendants' citation to the record does *not* clearly establish that a depressive or anxiety disorder was an objective source of plaintiff's physical disability. Indeed, as plaintiff points out, defendants have only selectively cited the administrative record. Defendants fail to note the critical fact that Dr. Kirz' report, for example, also states:

18

"subsequent to his injury, [plaintiff] appears to have developed a significant reactive depression, which could be characterized as a major depressive episode or an adjustment disorder with depressed mood." AR 580-81. In other words, plaintiff's depression was in *reaction to* his physical condition. This is distinct from a finding that plaintiff's depression was a contributing factor to plaintiff's physical condition. While defendants note that the depressive disorder need not be the initial or sole cause of the alleged disability in order for the Limited Benefits Period provision to apply, they do not dispute that the depressive disorder must nonetheless be a contributing cause of the disability.

In sum, the evidence simply does not support such a conclusion here. And since there is no other evidence linking plaintiff's depressive symptoms to a contributing cause of his disability, the court can find no basis upon which to apply the Limited Benefit Period provision to plaintiff's claim.

Accordingly, defendants' motion for summary judgment on this ground is DENIED.

3.  Attorney's Fees and Costs

An award of fees and costs is authorized pursuant to 29 U.S.C. § 1132(g)(1). As plaintiff notes, an award of fees and costs is generally made absent special circumstances that make such an award unjust. See Conseco v. Constr. Laborers Pension Trust, 93 F.3d 600 (9th Cir. 1996).

No such circumstances are present here, and defendant presents no persuasive argument in opposition. Accordingly, the court hereby GRANTS plaintiff's request for an award of reasonable attorney's fees, and costs. The parties shall first attempt to negotiate a reasonable amount of fees and only if unsuccessful, plaintiffs shall file a motion for fees and costs pursuant to Civil Local Rule 54-5.

C.  Conclusion

For the foregoing reasons, the court hereby GRANTS plaintiff's motion for summary

judgment, and DENIES defendants' cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: August 19, 2010

_____
PHYLLIS J. HAMILTON
United States District Judge